IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN J. MURPHY, )
                Plaintiff, )
                   )
     vs )       Civil Action No. 11-1512
                   )
CENTER FOR EMERGENCY MEDICINE )    Judge Bissoon
OF WESTERN PENNSYLVANIA, INC. )    Magistrate Judge Mitchell
d/b/a STAT MEDEVAC, )
                Defendant. )

REPORT AND RECOMMENDATION

I.     Recommendation

It is respectfully recommended that the motion for summary judgment filed on behalf of

the Defendant (ECF No. 24) be granted.

II.    Report

Plaintiff, John J. Murphy, brings this employment discrimination action pursuant to the

Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34 (ADEA), and the Pennsylvania

Human Relations Act, 43 P.S. §§ 951-63 (PHRA), against the Defendant, Center for Emergency

Medicine of Western Pennsylvania, Inc. d/b/a Stat MedEvac ("CEM").  He alleges that

Defendant discriminated against him on the basis of his age (58) when it terminated him from his

position as an aircraft mechanic on June 8, 2010.

Currently pending for resolution is a motion for summary judgment, brought on behalf of

the Defendant.  For the reasons that follow, the motion should be granted.

Facts

CEM arranges, coordinates and operates air ambulance services.  CEM employs aircraft

mechanics to service and maintain its fleet of aircraft.  (Horgan Dep. Ex. 36 at. 2.)[1]

Plaintiff was born on August 28, 1951.  (Murphy Dep. at 7.)[2]  Plaintiff states that he was hired by Stat MedEvac in May of 2002 when he was 50 years old, and that he had been working there without interruption when CEM acquired the company in 2007, when he was 55.  (Murphy Dep. at 28;[3] Murphy Dep. Exs. 1, 22, 28.[4])  Defendant responds that, although Plaintiff was 55 years old in February 2007 when CEM acquired Stat MedEvac from its owner, C.J. Systems, this information is immaterial because Rick Claypool, Fixed Base Manager and Murphy's direct supervisor, was not hired until September 2007.  (Claypool Dep. at 9.)[5]  Claypool is the person who allegedly treated Murphy differently because of his age. (Murphy Dep. at 243-44.)  In addition, Plaintiff was not simply transferred to the rolls of CEM, but was hired by CEM in February 2007.  (Murphy Dep. at 7-8.)  He admits that he sent an employment application to CEM and that CEM was under no obligation to hire him.  (Murphy Dep. at 77-78.)

The parties spend a considerable amount of time debating what Plaintiff's job title was. Plaintiff states that Chris Cura, the Director of Maintenance at Stat MedEvac in 2007, told him that he was being hired as an "avionics technician," the same position he held when Stat MedEvac was part of C.J. Systems.  (Murphy Dep. at 28, 39, 41, 43-44 & Ex. 1.)[6]  Cura gave him a name plate referring to him as an "Avionics Manager."  (Murphy Dep. at 44; Winkle Dep.

---

[1] Unless otherwise indicated, all citations to Horgan's deposition and exhibits thereto are contained in Defendant's Appendix (ECF No. 27) Ex. G.

[2] Unless otherwise indicated, all citations to Plaintiff's deposition and exhibits thereto are contained in Defendant's Appendix, ECF No. 27 Ex. H.

[3] Pl.'s App. (ECF No. 32) Ex. 32.

[4] ECF No. 32 Exs. 33, 41, 45.

[5] Unless otherwise indicated, all citations to Claypool's deposition (but not the exhibits thereto) are contained in Plaintiff's Appendix (ECF No. 31) Ex. 7.

[6] ECF No. 32 Exs. 32, 33.  "Avionics" refers to the electrical systems on an aircraft.  (Claypool Dep. at 18-19.)

Ex. 27.[7]) And Plaintiff has proffered a certificate, dated March 1, 2007, which states (in the context of indicating that he completed certain training) that his job title was "Avionics Manager." (Hardesty Dep. Ex. 42.)[8] <u>But see</u> Murphy Dep. at 158, 227 (admitting that he was or "could be considered" a Fixed Base Mechanic).

By contrast, Defendant responds that there are no formal company documents referring to Murphy as an "avionics technician" and that there are no job descriptions making reference to such a position. Rather, the job descriptions are for the two positions held by mechanics at CEM, Site Mechanics and Fixed Base Mechanics. (Murphy Dep. Ex. 7 at CEM-00390, CEM-00403 to CEM-00406.)[9] Charles Horgan, who became Director of Maintenance in April 2010, called Murphy a Fixed Base Mechanic and testified that Murphy's duties did not differ from the duties listed for Fixed Base Mechanics. (Horgan Dep. at 49-52, 54.)[10]

Defendant has produced the February 5, 2007 letter confirming Plaintiff's offer of employment, which states that "Your official appointment will begin Monday, February 26, 2007 (this will remain your annual anniversary review date) in the position of full-time Fixed Base Mechanic for the STAT MedEvac Program, Department at an annual rate of $65,000." (Murphy Dep. Ex. 2.)[11] Plaintiff acknowledged at his deposition that this is what the letter stated. (Murphy Dep. at 80.) In addition, Murphy's performance evaluations referred to him as a "Mechanic" (Murphy Dep. at 128;[12] Claypool Dep. Exs. 9, 10[13]) and the position for his replacement sought a "Fixed Base Mechanic." (ECF No. 40 Ex. O.)

---

[7] ECF No. 32 Ex. 48.
[8] ECF No. 32 Ex. 27.
[9] Def.'s Supp. App. (ECF No. 40) Ex. J.
[10] ECF No. 40 Ex. K.
[11] ECF No. 40 Ex. J.
[12] ECF No. 40 Ex. J.
[13] ECF No. 40 Ex. L.

Plaintiff argues that, even if his job title technically was Fixed Base Mechanic, he was considered an avionics technician based upon his experience, as were two other Fixed Base Mechanics, Greg Winkle and Don Wilson. (Murphy Dep. at 41;[14] Horgan Dep. at 56-58;[15] Claypool Dep. Ex. 2.[16]) He contends that he was assigned to train other Fixed Base Mechanics in avionics.

Defendant responds that Claypool testified there was no specific difference between avionics and mechanics at the hangar. (Claypool Dep. at 18.) He testified there were not different people designated as avionics technicians and mechanics. (Claypool Dep. at 19.) He stated that Murphy was not the avionics manager, either officially or unofficially. (Claypool Dep. at 22.) He did assign Murphy to train Winkle and Wilson based upon his avionics experience, however. (Claypool Dep. at 35, 42-43.) Horgan testified that Murphy's experience allowed him to do another part of the job, "but it didn't give him a different job description." (Horgan Dep. at 57.)[17]

Winkle testified that never at any point in his time at CEM was avionics his main job (Winkle Dep. at 8-9.)[18] Winkle testified no one at CEM had the primary job of handling avionics problems. (Winkle Dep. at 9.)

Regarding the certificate, Senior HR Consultant Stacey Hardesty was asked, "Do you recognize this?" and she responded, "No." As Hardesty explained, "I wasn't in this role at that point." When asked if she had ever heard the term "Avionics Manager" Hardesty responded

---

[14] ECF No. 32 Ex. 32.
[15] ECF No. 32 Ex. 29.
[16] ECF No. 33 Ex. 8.
[17] ECF No. 40 Ex. K.
[18] Unless otherwise indicated, all citations to Winkle's deposition (but not the exhibits thereto) are contained in Defendant's Supplemental Appendix (ECF No. 40) Ex. N.

"No."  (Hardesty Dep. at 74, 92.)[19]

The Court concludes that, although Plaintiff has pointed to certain evidence that he considered himself an avionics technician, he has not proffered evidence that CEM, and particularly his supervisors,[20] thought he held such a position. Therefore, for purposes of this case, he was a Fixed Base Mechanic.

Defendant indicates that there are two types of mechanics at CEM, Fixed Base Mechanics and Site Mechanics.  (Horgan Dep. Ex. 36 at 2.)  Both types of mechanics perform the same job, that is, they are responsible for maintaining the helicopters in the Stat MedEvac system.  The only difference between the Fixed Base Mechanics and the Site Mechanics is where they work and how they are paid. (Horgan Dep. at 80.)  Plaintiff states that Site Mechanics also do not perform heavy maintenance; they inspect the aircraft every day and make small repairs to ensure that the aircraft is air worthy.  (Murphy Dep. at 81.)

The Fixed Base Mechanics work at the Allegheny County Airport and are scheduled to work a regular 40-hour work week. (Horgan Dep. Ex. 36.)  Site Mechanics are scheduled to work 10 days on and 4 days off, and are paid 80 hours every two weeks (Horgan Dep. at 74-77 & Ex. 36.)

Site Mechanics go to their base every day, inspect the aircraft, perform any necessary repairs, and then are on call twenty four hours a day, seven days a week.  (Horgan Dep. at 74-77.)  Plaintiff notes that the actual daily inspection each day may only take one to two hours, but because the Site Mechanic remains on call the rest of the day and may have to come back in to fix the aircraft, the Site Mechanic is paid for 80 hours every two weeks.  However, if the Site

---

[19] Unless otherwise indicated, all citations to Hardesty's deposition (but not the exhibits thereto) are contained in Defendant's Supplemental Appendix (ECF No. 40) Ex. M.

[20] Cura left CEM in 2010.  (Murphy Dep. at 80; Claypool Dep. at 11-12, ECF No. 27 Ex. E.) Plaintiff has not proffered testimony from him.

Mechanic actually works more than 40 hours in a week, he is paid overtime, as is the Fixed Base Mechanic.  (Horgan Dep. at 77.)

Defendant states that Plaintiff knew when he accepted the Fixed Base Mechanic position in February 2007 that the Site Mechanics were paid differently than the Fixed Base Mechanics (Murphy Dep. 81, 228.)  Plaintiff responds that he did not know that Fixed Base Mechanics are paid differently from Site Mechanics when they perform the same function on weekends. (Claypool Dep. Ex. 24.)[21] Although they are paid differently, the Fixed Base Mechanics and Site Mechanics "have all just functioned as one unit." (Horgan Dep. at 80.)

Stat MedEvac has seventeen bases in Pennsylvania, Ohio, Maryland and Washington, D.C.  (Horgan Dep. Ex. 36 at 2.)  Each of the bases is numbered, and the base known as MedEvac 4 is located at the Allegheny County Airport.

Because of its location, the Fixed Base Mechanics were asked to cover for the Site Mechanics at MedEvac 4.  On May 13, 2010, Claypool sent an e-mail stating, "Make sure two of you guys daily Med 4 first thing in the morning."  On July 29, 2009, a message stated "the hangar will cover med 4 on August 7, 8, 9 and 20, 21, 22, 23 as per Tom and Rick."  (ECF No. 27 Ex. B.)

Every weekend, a Fixed Base Mechanic is on call, because Stat MedEvac is a 24-hour, 7-day a week operation, in light of the fact that medical emergencies do not only happen during normal working hours.  (Murphy Dep. at 146-47, 160.)

<u>Murphy's Relationship with his Direct Supervisor, Claypool</u>

Claypool began working for CEM in September 2007 as the Fixed Base Manager, approximately seven months after Murphy started.  (Murphy Dep. 83-85; Claypool Dep. at 9.)

---

[21] ECF No. 31 Ex. 25.

As the Fixed Base Manager, Claypool reported directly to the Director of Maintenance, who, in 2007, was Chris Cura, succeeded by Charles Horgan in April 2010. (Claypool Dep. at 9, 55; Horgan Dep. at 8.)[22]

Before Claypool was hired, Murphy had been reporting directly to Cura, the Director of Maintenance. (Murphy Dep. at 76-77.) After Claypool was hired, Murphy reported directly to Claypool. (Murphy Dep. at 90.)

Murphy and Claypool had previously worked together at C.J. Systems as peers. (Murphy Dep. at 85.) Murphy described his relationship with Claypool as "a friend," both during his employment with CEM and at C.J. Systems (Murphy Dep. at 85-86.) Murphy and Claypool socialized on a number of occasions, including attending approximately 15 to 20 NASCAR events together, until October 2009 when Claypool issued a written reprimand to Murphy, as described below. (Murphy Dep. at 86-88.)

Murphy did not think Claypool was "management material," although he indicated that Claypool did "ok" as a manager. (Murphy Dep. at 89.) Defendant states that, in an email Claypool sent to Murphy on January 6, 2008 regarding Claypool being the only manager in the hangar, Murphy responded, "Now I know how Rodney Dangerfield felt." (Murphy Dep. Ex. 16.) Plaintiff explained that he was "making a joke" and referring to comedian Rodney Dangerfield's famous act about getting "no respect." (Murphy Dep. at 163-64.)[23] He indicated that CEM employees and managers regularly sent this type of joke to each other in response to emails. (See e.g., ECF No. 31 Ex. 1, at CEM-00968-69, CEM-001005-06.)

On November 9, 2009, Claypool notified Murphy, who had called off sick, that he should have called in to Claypool as his supervisor, as he was required to do. (Murphy Dep. Ex. 17.)

---

[22] ECF No. 27 Ex. E; ECF No. 32 Ex. 29.
[23] ECF No. 32 Ex. 32.

Murphy explained that it was procedure to call or text a mechanic in the hangar since Claypool did not arrive that early, and then the mechanic would tell Claypool when he came in. (Murphy Dep. at 172-74.)

On-Call Rotation Schedule and Murphy's Reprimand in October 2009

Beginning in 2008, Claypool began a system of randomly rotating the Fixed Base Mechanics for on-call weekends in order to evenly distribute the work and the burden of working on the weekend. (Claypool Dep. at 67-68, 175-79, 183-85 & Ex. 18[24]; Murphy Dep. at 152, 154-55; ECF No. 40 Ex. P.) When the on-call rotation was first established, Murphy complained that he did not want to be placed on the on-call list. (Murphy Dep. at 150-51.)

Cura agreed that Murphy, Winkle and Wilson, who all had experience in avionics, would not be placed on the on-call list, as long as they agreed to take avionics calls. (Murphy Dep. at 150-51, 177.) Because Winkle and Wilson did not believe this was fair to the other Fixed Base Mechanics, they asked to be placed back on the on-call list (Murphy Dep. at 151; Winkle Dep. at 114.)

Murphy did not request to be placed back on the on-call list. (Murphy Dep. at 151.) Instead, in exchange for Murphy handling the avionics calls, Cura agreed to take him off the on-call rotation list so he did not have to come in on the weekends. (Murphy Dep. at 151; Claypool Dep. at 157.[25])

Claypool states that he began receiving complaints from Horgan, Tom Rolison (the Site Manager), and some Site Mechanics that Murphy would not answer his telephone calls. (Claypool Dep. at 55, 107, 137-38[26]; Horgan Dep. at 96.[27]) Plaintiff contends that Claypool

---

[24] ECF No. 27 Ex. E.
[25] ECF No. 40 Ex. L.
[26] ECF No. 40 Ex. L.

never tracked anyone else's calls (Claypool Dep. at 143), but Claypool testified that he never received complaints about anyone else and that he was directed by Cura to document the complaints he received about Murphy.  (Claypool Dep. at 142, 145-46, 150.)[28]  Murphy admitted that he missed two legitimate telephone calls on October 9 and 22.  (Murphy Dep. at 176.)

On October 26, 2009, Plaintiff received a written reprimand from Claypool which stated as follows:

> I (Rick Claypool) tried to call Mr. Murphy on the evening of June 21, 2009 about a AHURs question I had.  I left a voice mail.  Mr. Murphy never responded. Date Entered: June 22, 2009.
>
> Tom Rolison tried to get a hold of Mr. Murphy on July 11, 2009.  Mr. Rolison called several times and left a message.  Mr. Murphy, however, did respond 2 days later on July 13, 2009.  Date Entered: July 13, 2009.
>
> Tom Rolison tried to get a hold of Mr. Murphy on August 1, 2009.  Mr. Rolison called several times and never received a response from Mr. Murphy.  Date Entered: August 3, 2009.
>
> Don Wilson tried to get a hold of Mr. Murphy on Oct. 9, 2009.  Mr. Wilson left a message and there was no response from Mr. Murphy.  Date Entered: October 12, 2009.
>
> Chuck Horgan called Mr. Murphy Thursday night October 22, 2009.  Mr. Murphy did not respond to Mr. Horgan's call.  Date Entered: 26 Oct, 2009.
>
> Walt Handwork called Mr. Murphy Saturday @ 0800 October 24, 2009.  Mr. Murphy did not respond to Mr. Handwork's call.  Date Entered: October 25, 2009.
>
> This is a written reprimand.  John has been counseled and has been reinstructed on his responsibilities and duties.

(Claypool Dep. Ex. 11.)[29]

Plaintiff wrote to Cura on October 28, 2009 to dispute the reprimand he received from

---

[27] ECF No. 40 Ex. K.
[28] ECF No. 40 Ex. L.
[29] ECF No. 31 Ex. 14.

Claypool:

Mr. Claypool stated that he tried to call me on June 21st, 2009 concerning an AHRU question he had. Since I was on vacation from 6/14/2009 to 6/27/2009, I was not required to answer my phone per Mr. Claypool's own written policy. Therefore, Mr. Claypool is reprimanding me for following his, and STATS own policy.

Three of the listed calls, July 11/2009, August 1/2009, and October 24/2009, were on a Saturday, when Mr. Claypool's weekend coverage is in effect. There was a mechanic listed for Avionics coverage for these 3 weekends, but according to Mr. Claypool, and Mr. Rolison, the on-call Avionics mechanic was not called before, OR AFTER I was called.

What I think this boils down to is I missed 2 legitimate phone calls on October 9/2009, and October 22/2009. In the time period we are talking about, I have answered hundreds of phone calls from mechanics, pilots, and managers.

If not answering my phone while I am on vacation merits a letter of reprimand, then so be it.

If missing 2 phone calls in 5 months merits a letter of reprimand, then so be it.

If not, then I am requesting the letter of reprimand be removed from all of my personnel files.

I think I have shown, over the last 7+ years to be a trusted, loyal, and competent employee, and I would like to continue to keep our aircraft in top avionics shape, without having my integrity questioned.

(Claypool Dep. Ex. 13.)[30]

Cura wrote back to Murphy that same day:

On the first issue you are correct. On the second issue we changed the original on call schedule[:] wink, you and don changed from the on call rotation for everything and made you 3 on call all the time just for avionics, that was your request, so it does not matter who or when got called, any of the three of you that did not answer your phone or at least call back in a timely [manner] was wrong.

On your third issue, you are correct. Additionally what was not listed on this was the 3 calls not answered from Walt this week.

The reason we all have company paid phones is if someone has a question, they

---

[30] ECF No. 31 Ex. 16.

call and the tech answers.  Simple.  It appears to me from what information is in front of me there is a trend here and it needs to stop.

I will be more than happy to correct/have Rick correct, the letter as to reflect what it have stated above.

You are an exceptionally valued employee and no one is questioning your integrity.  We just simply want you to answer the phone like all the other technicians do.

(Claypool Dep. Ex. 15.)[31]

Plaintiff wrote back to Cura:

The 3 calls from Walt that I didn't answer occurred while I was wiring a 78 pin connector on the GPWS computer.  I put my phone in my tool box, so as not to be distracted while I was working.  This is a policy here in the hangar that Rick initiated so we were not distracted while doing critical work.
So, what we have here is 5 unanswered calls in the last 5 months.  I don't think that warrants any kind of letter in my file, and I still would like the letter removed.

(Claypool Dep. Ex. 15.)  In addition, Murphy stated that he suggested to Cura that Claypool should be "counseled" for including inaccurate information in the reprimand. (Murphy Dep. at 178-79.)

Murphy contends that, shortly after this incident, Claypool removed the computer he needed to locate parts and manuals for work.  (Claypool Dep. Ex. 16;[32] Claypool Dep. 171-72; Winkle Dep. at 107-08.)  It is noted that the actual citations indicate only that Claypool moved the computer because he was reorganizing the avionics shop.  Winkle observed that Murphy was "displeased" about it.

The On-Call Assignment in May 2010

After the reprimand, in January 2010, Murphy was placed on the regular rotation

---

[31] ECF No. 31 Ex. 17.  The letter of reprimand has the first item scratched out with the notation "John was on vacation.  This item was removed from permanent file.  Attached is the revised agreed to letter."
[32] ECF No. 31 Ex. 18.

schedule along with the other Fixed Base Mechanics to work on weekends. (Murphy Dep. at 152.) As part of the regular rotation, Murphy had been assigned to be on call Memorial Day weekend of 2010. (Murphy Dep. at 123-24, 154-55; Claypool Dep. at 160.[33])

Murphy did not want to work the holiday weekend. (Murphy Dep. at 234.) On May 14, 2010, Murphy sent an e-mail to the other Fixed Base Mechanics which stated, "Anyone interested in taking my weekend coverage 5/29 and 5/30, for the overtime plus an extra $50. This would not be a trade." (Murphy Dep. at 187-88; Claypool Dep. Ex. 17.[34]) By his comment, "[t]his would not be a trade," Murphy meant he did not have to pay it back if someone offered to trade with him. (Murphy Dep. at 188.) Murphy had no recollection of ever taking someone else's weekend. (Murphy Dep. at 190.) In addition, he had never seen anyone else ever try and pay somebody to work their overtime. (Murphy Dep. at 190.) No one offered to cover his weekend for him. (Murphy Dep. at 188-89.)

In addition to being on call for the hangar, Murphy was also assigned to cover for the Site Mechanic at MedEvac 4. On May 18, 2010, Claypool informed Murphy:

> Due to Base Site vacancies and personnel changes in the STAT Medevac system, I need you to cover Medevac 4 the weekend of May 29th and May 30th. This will be during your regular hangar on call weekend. You will need to do the daily each morning at shift change and will be on call for Med 4 in addition to hangar on call. This is just for Saturday the 29th and Sunday the 30th. On Monday the 31st of May you will just be on call for the hangar. If there are any questions please don't hesitate to contact me.

(Claypool Dep. Ex. 19.)[35] Murphy never approached Claypool to ask him anything about the

---

[33] ECF No. 40 Ex. L.
[34] ECF No. 31 Ex. 19.
[35] ECF No. 31 Ex. 21. Plaintiff disputes that this coverage issue arose in the normal course of business and points to evidence that would allow for the inferences that: 1) Claypool had learned he did not want to work Memorial Day weekend; and 2) the site vacancy actually arose at MedEvac 17 in Erie, but Claypool shifted the Site Mechanics around so that the vacancy was at MedEvac 4 and he could assign it to Murphy. (Claypool Dep. at 185-88, 198-99 & Ex. 17, ECF

weekend.  (Murphy Dep. 213-14.)  Instead, Murphy went directly to Horgan, Claypool's

supervisor, and told Horgan that he was nervous about performing a daily inspection of an

aircraft, something he had never done before.  (Murphy Dep. 193, 212-13.)

Plaintiff does not know whether covering for Site Mechanics was part of a Fixed Base

Mechanic's job responsibilities, but he contends that it was not part of his job duties because his

only experience was in avionics.  (Murphy Dep. at 190-91.)  However, as discussed above,

Murphy was a Fixed Base Mechanic at CEM and the job description for the Fixed Base

Mechanic specifically provides that the Fixed Based Mechanic will provide the Fixe Base

Maintenance Manager "with the current airworthiness status of the base aircraft." (Murphy Dep.

Ex. 7 at CEM-00404.)[36]  Claypool stated that the training Murphy received on the EC 145 in

2005 includes how to complete a daily inspection and is aircraft specific. (Hardesty Dep. Ex. 43

at CEM-00722;[37] Claypool Dep. at 192[38].) Winkle also testified that to his knowledge, Murphy

knew how to do a daily inspection, and because Murphy went to factory training, he knew how

to do a daily inspection. (Winkle Dep. at 74.)

Murphy notes that Claypool testified he never asked for other volunteers to cover the site

instead of Murphy (Claypool Dep. at 208.)  Nor did Claypool consider covering it himself,

though that is one of the duties listed in the Fixed Base Manager job description.  (Horgan Dep.

Ex. 30.)[39]  Claypool's explanation was that since he was "salary exempt" he "would have gained

---

No. 31 Ex. 19; ECF No. 31 Ex. 2.)  However, he has not explained how this dispute is material to
the case, as it is undisputed that Fixed Base Mechanics could be assigned to cover for Site
Mechanics over weekends, that Murphy had not yet done so and that he was not being singled
out for this task.  Although Murphy did not want this assignment, it was part of his job and he
would be hard pressed to contend that the assignment itself constituted age discrimination.
[36] ECF No. 40 Ex. J.
[37] ECF No. 32 Ex. 28.
[38] ECF No. 40 Ex. L.
[39] ECF No. 32 Ex. 30.

nothing by covering it." (Claypool Dep. at 204.)

According to Claypool, as long as a mechanic had the Aircraft and Powerframe license, the Fixed Base Mechanic was able to do anything on the aircraft. (Claypool Dep. at 27.) However, Plaintiff disputes that any mechanic with an Aircraft and Powerframe license is automatically capable of "do[ing] anything on the aircraft." (Claypool Dep. at 27.) In fact, even at Stat MedEvac, mechanics attend additional training schools and are sometimes instructed to train co-workers with less experience. (Claypool Dep. Ex. 2 at CEM-00312[40]; Claypool Dep. at 35.) Further, sometimes even with training and the Aircraft and Powerframe license, mechanics are incapable of performing certain tasks safely. (Claypool Dep. Exs. 7, 8.)[41]

Defendant states that Murphy received his A&P license in 1988, and received training on the aircraft at issue, the EC 145, in 2005 (Murphy Dep. Exs. 1, 29.) Plaintiff responds that he received his FAA Airframe license in 1977. (Murphy Dep. Ex. 1.) He earned his FAA Powerplant license in 1988. He completed an "Airframe Maintenance Course" on the EC 145 in 2005. (Murphy Dep. Ex. 29.) Murphy states that the maintenance course was intended to "familiarize" attendees with the EC 145 aircraft. (Murphy Dep. at 19.)[42] Plaintiff disputes any inference that the Airframe and Powerplant licenses and his familiarization training on the EC 145 aircraft alone qualified him to perform a daily air-worthiness inspection of the aircraft and certify that it could be flown safely—in other words, those qualifications alone did not enable him to safely perform the job of a Site Mechanic at Stat MedEvac. He states that he worked exclusively in avionics maintenance. (Murphy Dep. at 20-30.)[43] However, Murphy knows of no other Fixed Base Mechanics who could not complete an inspection. (Murphy Dep. at 194.)

---

[40] ECF No. 33 Ex. 8.
[41] ECF No. 31 Exs. 11, 12.
[42] ECF No. 32 Ex. 32.
[43] ECF No. 32 Ex. 32.

On May 21, 2010, Murphy wrote to Horgan: "Are there any site jobs open at this time???" (Horgan Dep. Ex. 33.)[44] Horgan responded as follows:

> DC .... Murph we can fix this thing. It's going to require capitulation on both parts though. [You're] a good man, set in your ways but a good man. I hate to lose you over resolvable issues.
> Alot [sic] of this was generated over on call... it doesn't make sense that you want a site. I'm trying to insulate the shop from on call as much as possible but its [sic] going to take time.
> In all honesty not for your sake but because site work should be done by site mechanics. Less chance for error.

(Id.) Both parties attempt to make much more out of this exchange than the text allows. Defendant argues that Murphy's inquiry about the availability of a Site Mechanic position undermines his contention that he was not qualified to cover for a Site Mechanic on Memorial Day weekend. However, Plaintiff explained at his deposition that he made this request because he was tired of the attitude he was receiving from Claypool, "being singled out for discipline and things like that." (Murphy Dep. at 192.) See also Horgan Dep. at 124[45] (noting that it was possible that Murphy was trying to get away from Claypool). He also stated that he assumed that he would be sent to training before he began such a job. (Murphy Dep. at 193.) In addition, Defendant's citation to Murphy's email represents an attempt to impeach his testimony on the issue of whether he felt he was capable of carrying out a Site Mechanic's duties. This is inappropriate in the context of a motion for summary judgment.

Plaintiff focuses on Horgan's statement that he was "set in his ways." Although this comment, taken out of context, is ambiguous and could be supportive of Plaintiff's case, the clear import of the comment in context is that Horgan was attempting to resolve Murphy's dispute with Claypool and that he did not want Murphy to leave. Horgan explained that both

---

[44] ECF No. 31 Ex. 31.
[45] ECF No. 40 Ex. K.

Murphy and Claypool felt strongly about their positions, but thought he could work out their differences. He denied that the phrase "set in his ways" had anything to do with age. (Horgan Dep. at 119-21.)[46] In addition, Plaintiff testified that Horgan was a "good supervisor" who "treated everybody fair." (Murphy Dep. at 160.)

In response to Murphy's "refusal" (Horgan's term) to do the job because he did not feel comfortable inspecting the aircraft, Horgan told Claypool to have Murphy shadow Winkle and Jason Dooley, both of whom are Fixed Base Mechanics, and Tom Eiter, who is a Site Mechanic. (Murphy Dep. at 196-97, 212-13; Horgan Dep. at 115-16[47]; Claypool Dep. at 191-92.[48]) Plaintiff completed his on-call assignment over the weekend, spending only one to two hours at MedEvac 4 on May 29 and May 30 performing the daily inspections. He did not get called in. (Murphy Dep. at 225-33;[49] Horgan Dep. at 116.)

Tuesday Morning Discussion

The day after Murphy worked his on-call weekend, Tuesday, June 1, 2010, he had a discussion over coffee with some of the other Fixed Base Mechanics, namely Winkle, Adam Backo and Bill Deemer. (Murphy Dep. at 223-24.) According to Murphy, one of the mechanics asked how the weekend went. (Murphy Dep. at 225.) As Murphy explained, "It was kind of standard procedure for the guy that was on call for the weekend, somebody would ask them did you get called in." (Murphy Dep. at 225.) Deemer (Murphy believes) told him that he only got paid two hours for working the site, and Murphy responded that was not right, he put down eight (or nine) hours for covering the site. (Murphy Dep. at 225-26, 230.) During that discussion, Winkle said something along the lines of "good luck because I don't think they are going to pay

---

[46] ECF No. 40 Ex. K.
[47] ECF No. 32 Ex. 29.
[48] ECF No. 40 Ex. L.
[49] ECF No. 40 Ex. J.

for it." (Murphy Dep. at 229.)

Murphy explained that he entered eight hours because that was his understanding of how Site Mechanics were paid and recorded their time. (Murphy Dep. at 227.) Nine hours appear on his time card because Murphy was also performing on-call duty for the hangar that weekend and, as he understood from his prior weekend on-call shifts, he was entitled to one hour of overtime pay for remaining on-call if he was not called into the hangar. (Murphy Dep. at 230-31; Claypool Dep. Ex. 24.[50]) However, he admitted that the three mechanics told him that "we only get paid two hours to do that." (Murphy Dep. at 237.)

Murphy testified that, since Site Mechanics are paid for 80 hours on each 10-day shift, he reasonably surmised that they were paid 8 hours for each day on-call. (Murphy Dep. at 225.) Defendant points to notes of a meeting held on January 25, 2010 in which it was explained how Fixed Base Mechanics would be paid for their on-call time on the weekend. (Claypool Dep. Ex. 5.)[51] Plaintiff stated that he did not recall ever attending a meeting at which he was informed about how to record on-call time when covering a site. (Murphy Dep. at 142, 156, 271.)[52]

Plaintiff states that Winkle (age 27 in 2010) had once covered a Site Mechanic's position and that after he returned home, Winkle was paid for the 8 hours he remained on call. (Murphy Dep. at 5, 229; Winkle Dep. at 98; Winkle Dep. Ex. 28.[53]) Defendant responds that, as Murphy admitted, Winkle covered the Site Mechanic position during the week, as opposed to on call for the weekend (Murphy Dep. at 229-30). Murphy was asked, "When Greg Winkle covered for the site, it was during the regular workweek; wasn't it?" Murphy responded, "I believe so, yeah." (Id.)

---

[50] ECF No. 31 Ex. 25.
[51] ECF No. 27 Ex. E.
[52] ECF No. 32 Ex. 32.
[53] ECF No. 32 Ex. 49.

Although Murphy had entered his time before this discussion, he had not yet approved his time, and could have immediately changed his time after this discussion, but did not do so. (Murphy Dep. at 226.) After this discussion, Murphy never asked anyone to clarify for him what time he should put down for working that weekend. (Murphy Dep. at 217, 233-34.) At his deposition, Murphy insisted that he asked Claypool at least twice if he had entered his time correctly and if he should change his time. (Murphy Dep. at 236.) However, as discussed below, Murphy did not talk to Claypool until June 4, when the investigation was already underway. (Murphy Dep. at 213.)

Murphy put nine hours each day on his time card for that weekend, yet admits he did not work nine hours each of those days (Murphy Dep. at 231-33 & Ex. 21.) Murphy maintains that he believed he was completing his time card correctly. He admits that he marked nine hours for May 29 and May 30—one hour for covering the hangar "on-call" duty and eight hours for covering the Site Mechanic's position. (Claypool Dep. Ex. 24.)

Claypool Becomes Aware of Murphy's Timecard

The parties dispute what happened next. Winkle testified that he went to talk to Claypool to ask about CEM's policy regarding recording time when performing a Site Mechanic's job. (Winkle Dep. at 80-81.)[54] Winkle testified that he spoke to Claypool alone, and that he asked Claypool how much pay he (Winkle) was entitled to for covering a Site Mechanic's position. He remembers telling Claypool something like, "if [Murphy] is getting paid for 8 hours for covering MedEvac 4, then I also want to." (Winkle Dep. at 81.) Winkle's recollection was that he approached Claypool alone, that he was not complaining and that he did not say that Murphy

---

[54] ECF No. 32 Ex. 47.

should be punished. (Winkle Dep. at 80-82.)[55]

Claypool's recollection of the same conversation is much different. (Claypool Dep. at 210-13.) Claypool testified that, on June 2, 2010, Winkle, Deemer and Backo approached him as a group to ask why they were not paid for eight hours when they covered a Site Mechanic's position. They stated that Murphy had indicated that he was putting down 9 hours total for the time and that "he was going to get paid for his inconvenience for that weekend." (Claypool Dep. at 211-12.) Claypool also considered the group's question to be a "complaint." (Claypool Dep. at 212-13.)

Plaintiff notes that he was not required to submit his timecard until Friday, June 4, 2010, and that timecards proceed through a two-step supervisor approval process for accuracy before being finally submitted to payroll. (Claypool Dep. at 214, 222-24; Hardesty Dep. at 86.)

Claypool Calls Horgan

Claypool testified that he felt he had to alert his supervisor to this issue. (Claypool Dep. 212.) Claypool called Horgan, the Director of Maintenance, who was on vacation, and told him that Murphy had lied on his time card intentionally and asked what should be done about it. (Horgan Dep. at 126.) When asked what Claypool said to substantiate his belief, Horgan said:

> Basically he told me that [Murphy] had had a discussion with some of the mechanics in the shop about how time was done, how time cards were done, and apparently informed one or two or three of the guys that he was going to put in 8 hours even though he had only been at the site for an hour or two. Because that's the way they do it. That's the way they get paid. That's the way I am going to do it.
>
> Apparently some of the guys informed him that, no, that's not the way it is done. That's not the way to do it and I wouldn't do that if I were you. He said, no, that's the way I am going to do it.

(Horgan Dep. at 128-29.)[56]

---

[55] ECF No. 32 Ex. 47.

Plaintiff contends that Claypool was so convincing in his rendition of the circumstances surrounding his timecard that Horgan did not feel it was necessary to ask Murphy any questions or investigate the matter at all before instructing Claypool to inform Hardesty of the situation:

> Q: You know, during that initial phone call you had with Mr. Claypool when you were on vacation, did you suggest to Mr. Claypool that he ask Mr. Murphy about the issue?
>
> A: You are saying when he called me about it?
>
> Q: That first phone call.
>
> A: No.
>
> Q: Any reason?
>
> A: Yes, because the reasons he stated is exactly what happened. I mean, he made it clear to me that John [Murphy] had intentionally lied on his time card. That was clear to me from what he said. That's what I have got out of it. I said document everything, and contact Stacey Hardesty.

(Horgan Dep. at 145-46.)[57]

Horgan testified that he told Claypool to gather statements from Winkle, Backo and Deemer[58] and to contact Senior HR Consultant Stacey Hardesty, who would investigate the matter. Horgan then called Hardesty and told her that Claypool would call her the next day with an issue involving Murphy, but he did not tell her anything about the timecard. (Horgan Dep. at 126-29;[59] Hardesty Dep. at 79-80; Hardesty Dep. Ex. 43.[60]) Plaintiff contends that Claypool never verified what he had actually recorded on his timecard, nor did Claypool ask him why he did so. Defendant responds that Claypool testified that he checked Murphy's timecard to see

---

[56] ECF No. 32 Ex. 29.
[57] ECF No. 32 Ex. 29.
[58] Claypool testified that he immediately asked the three mechanics for their statements before he spoke to Horgan. (Claypool Dep. at 212-13.)
[59] ECF No. 32 Ex. 29.
[60] ECF No. 32 Ex. 28.

how much time he put on it, and saw that he had put 9 hours. (Claypool Dep. at 223-24.)

Plaintiff notes that Horgan never asked him about his timecard and he did not direct Claypool to find out more about it. As Horgan put it, Claypool "made it clear to me that [Murphy] had intentionally lied on his timecard. That was clear to me from what [Claypool] said." (Horgan Dep. at 146, 159.)[61]

The Investigation

The next day, June 3, 2010, Claypool emailed Hardesty in the morning to say that he had to talk to her about "an employee issue." (Hardesty Dep. Ex. 43 at CEM-00708.) She called him back and they discussed the situation. Claypool sent Hardesty a printout of what Murphy had coded into the timecard system (Kronos). (Hardesty Dep. at 81-82.) Claypool then gathered statements from Winkle, Backo and Deemer and submitted them to Hardesty. Backo wrote that:

> On the morning of June 1st, after returning from Memorial Day weekend, I witnessed John Murphy expressing his disgust about being "on call" over the past weekend. I heard him say he charged 8 hours for being on call for Med 4 for both Saturday and Sunday. He said the site mechanics bill 8 hours per day worked, and that he had the same intentions. He was planning to charge 9 hours per day on call. One hour as hangar on call pay and 8 hours ME4 on call pay.

(Hardesty Dep. Ex. 43 at CEM-00714.) Deemer wrote that:

> On the morning of June 1st, Greg Winkle, Adam Backo, John Murphy, And Myself were sitting in the hangar. John was asked how his weekend on call was. He stated that he didn't get called in. He said he put 9 hours of overtime in for each day. It was stated to him that we only get 1 hour for the hangar on call and 1 hour for on call for the site unless you get called in. John stated that the site mechanics get paid for 8 hours a day and that he should be paid 8 hours a day for his inconvenience.

(Hardesty Dep. Ex. 43 at CEM-00715.) Winkle wrote in part that Murphy "said he felt this was fair because he was doing two jobs. I told him good luck because I don't think they (CEM) are going to pay for it." (Hardesty Dep. Ex. 43 at CEM-00716.) In his email forwarding the

---

[61] ECF No. 32 Ex. 29.

statements to Hardesty, Claypool stated that Murphy "was very disgruntled about having to be on call and made several attempts to get out of it." (Hardesty Dep. Ex. 43 at CEM-00709.)

Hardesty reviewed the statements. (Hardesty Dep. at 89.) She states that she came to the conclusions that: 1) Murphy had put down 8 hours of time for his on-call coverage of MedEvac 4 because he felt he was being inconvenienced for having to work over the weekend; 2) this was not company policy; and 3) Murphy was either aware that what he had done was improper or was made aware of it by what the other mechanics had said and yet had not gone back to change his timecard. (Hardesty Dep. at 95-99.) She testified that, if Murphy had asked a manager before entering his time if he was correct in his assumptions about how he should record his time, he would not have been fired. (Hardesty Dep. at 99-100.) However, she testified that, because he entered 8 hours of time and considering that he had made known that he did not want to work that weekend and that fellow mechanics had told him he was not entering the time correctly and he did not attempt to change it or ask a manager about it, she concluded that he was attempting to "steal time" from the company. (Hardesty Dep. at 100-02.)

Late in the afternoon of June 3, Hardesty wrote to Claypool as follows:

We need one more thing to get through this process. You will need to sit down with [Murphy] Friday morning and tell him that it's been brought to your attention that he falsified his time card with hours he did not work over the weekend. He will need to provide us with a written statement, right then so you can leave the room and let him do so, have him sign and date it then send it over to me ASAP. I am leaving around noon Friday so I'd like it early morning if possible.

(Hardesty Dep. Ex. 43 at CEM-00718.) See also Hardesty Dep. at 105-06.

Friday, June 4, 2010

On Friday morning, Claypool met with Murphy and asked for his written statement.

22

(Claypool Dep. at 231.)[62]  Murphy described the encounter as follows:

> He said there's a discrepancy—I don't know how he exactly put it, but there's a problem or discrepancy with your time card.  And I said, well, what's the problem?  He said, well, you put nine hours down for covering the site for a site mechanic job on Saturday and Sunday.  And I said, yeah.  He said, well, you don't get paid nine hours for covering the site. I asked him, well, what do I get paid for covering the site?  And I still remember his answer was seven out of eight mechanics in here know what you get paid for covering the site.

> And I told Rick, well, since I've never worked the site, since I've only done avionics work, I didn't know.  I assumed it was eight hours.  He then told me to write a letter explaining why I put down nine hours for both days, and sign it and give it to him.  And that's what I did.

(Murphy Dep. at 236.)

In his statement, Murphy wrote as follows:

> I have been asked to write a letter explaining my time card entries for the pay period ending 6/5/2010.
> I believe the days in question are 5/29/2010, 5/30/2010, and 6/1/2010.
> In an E-mail dated 5/18/2010, I was instructed to cover ME 4 as a site mechanic on 5/29/2010, and 5/30/2010, while I was also on call for the hangar for those days, plus 5/31/2010.
> For 5/29/2010, and 5/30/2010, I entered 8 hours for the site mechanic position, and 1 hour for the hangar coverage position.  Since I had never worked as a site mechanic, I assumed they were paid 8 hours for each day they worked their assigned site.  I knew we were paid 1 hour of overtime for the hangar coverage, since I had worked that position before.
> For 6/1/2010, I entered 1.5 hours, which was actually worked on 5/31/2010, since I was unable to enter any time on that day with the holiday time entered.  Kronos would not let me enter any time on 5/31/2010.  This has happened in the past, and I was told, by my manager, that it was ok to put the time on the next day, so I would be paid the full 1.5 hours for covering the hangar.
> Since there are no written guidelines for how to enter, or what hours to enter, when covering a site, and this was the first time I had ever done this job, I assumed I was entering the correct times for the days I worked.
> If I have made incorrect assumptions concerning my time entered, please let me know what I should change, and I will do so immediately.

(Hardesty Dep. Ex. 43 at CEM-00721.)

Claypool sent the statement to Hardesty along with the following comments:

---

[62] ECF No. 27 Ex. E.

I met with Mr. Murphy this morning, although not received well his signed statement is attached. I have read the letter and in response feel that all The Fixed Base Mechanics have been thoroughly briefed on the responsibilities concerning pay and job duties when covering a base site. I have not had any trouble in the past with any of the Fixed Base [M]echanics['] [timecards] or complaints for coverage. If and when problems arise, it has been policy that there is an open door for questions or concerns with no threat of employment loss. Mr. Murphy, in my opinion, is a disgruntled employee who continues to cause discontent among his peers. This in turn causes distractions and a[n] unsafe work environment which is a huge human factors issue in our industry.

(Hardesty Dep. Ex. 43 at CEM-00718.)[63] Claypool also forwarded to Hardesty his May 18, 2010 email message directing Murphy to handle on call duty at MedEvac 4 on Memorial Day weekend, along with these comments:

The last statement gives him the option to ask any related questions in regards to the on call. He did go to Chuck Horgan and said that he did not know how to complete a daily on the aircraft and stated that he was not qualified to take call. Our mechanic training records shows his certificate for the successful completion of the EC 145 (BK 117) factory school. The school includes how to complete a daily and is aircraft specific. We then trained him for the whole week prior to his on call, retraining him on how to perform a proper daily on the aircraft that he would be covering.

(Hardesty Dep. Ex. 43 at CEM-00722.)

Hardesty testified that, although Murphy wrote that he simply assumed how to put in the time because he did not know what to do, she concluded that he had intentionally falsified his timecard, based upon the mechanics' statements and Claypool's indication that the issue had been made clear at meetings. (Hardesty Dep. at 107-16, 124.) When asked for the factors she considered, she responded:

The witness statements indicating [Murphy] was instructed that this is normally how they would code their time. He said he was going to code eight hours each day because he was inconvenienced for working over the weekend,

---

[63] Hardesty testified that she did not take into consideration Claypool's comments that Murphy was a "disgruntled employee who continues to cause discontent among his peers" and that this caused distractions and an unsafe work environment. (Hardesty Dep. at 107-08.) However, only the trier of fact could assess the credibility of this testimony if this case were to proceed to trial.

and he was still coded in Kronos when he was asked to provide a statement.  He never asked for clarification.  He never asked for assistance until he was asked to provide a statement.

(Hardesty Dep. at 119.)  See also Horgan Dep. at 148[64] (concluding that Murphy was lying in his statement when he said it was an accident).

Murphy testified that, later that afternoon, he asked Claypool about the timecard:

> I believe it was a little bit after 3:00 in the afternoon and I leave at 3:30. So I found Rick in the hangar and I approached him and I asked him, what are you going to do or what are we going to do about the time card deal?  I said, it's time for me to approve my time card because I'm going to be leaving at 3:30.  I said, what do you want me to do?  He said, I haven't heard anything. Approve it as it is.  So I went into the library and approved my time card.

(Murphy Dep. at 238.)[65]  Claypool testified that he was instructed by Hardesty to approve Murphy's timecard as written and that he would not have allowed Murphy to alter his timecard at that point because of the complaints that had been received from the three mechanics.  (Claypool Dep. at 229-30.)

Hardesty concluded that Murphy should be terminated and she discussed her recommendation with her supervisor, with the legal department and with the President and CEO of CEM, Doug Garretson, who all agreed with Hardesty's recommendation.  (Hardesty Dep. at 122-23.)  However, she wanted to wait until Monday, June 7, when Horgan would return from his vacation.  (Hardesty Dep. at 116, 122.)  She states that she did not speak to Murphy at all, nor did she ask Claypool what his opinion was.  (Hardesty Dep. at 123.)  See also Claypool Dep. at 233 (he did not give his opinion to anyone).[66]

Murphy is Terminated

---

[64] ECF No. 40 Ex. K.
[65] ECF No. 32 Ex. 32.
[66] ECF No. 40 Ex. L.  Nevertheless, as discussed below, Claypool had sufficient involvement in the process for Plaintiff to invoke the "cat's paw" theory of liability.

On Monday, Horgan spoke to Hardesty, Claypool and several other individuals and agreed with the proposed course of action. (Horgan Dep. at 155, 157-60.)[67] Murphy was terminated in a meeting with Horgan, Claypool and Director of Operations John Kenny on Tuesday, June 8, 2010. (Horgan Dep. at 157; Murphy Dep. at 242.)

He was replaced at CEM by a younger mechanic, Bob Hribal (age 45 in 2010). (Horgan Dep. at 165-66;[68] Claypool Dep. at 242; Winkle Dep. at 100; Def.'s Answer Pl.'s Interrog. No. 13[69].) Plaintiff notes that, at termination, he was CEM's oldest employee. (Def.'s Answer Pl.'s Interrog. No. 8.) Defendant responds that "the mere fact that [the plaintiff] was the oldest employee in his department does not create a discriminatory inference capable of surviving summary judgment." Abels v. Dish Network Serv., LLC, 2011 WL 7113309, at *8 (W.D. Pa. Dec. 15, 2011) (quoting Helfrich v. Lehigh Valley Hosp., 2005 WL 670299, at *13 (E.D. Pa. Mar. 18, 2005)), aff'd mem., 2012 WL 6183558 (3d Cir. Dec. 12, 2012).

Murphy's Internal Grievance

After Murphy was terminated, he filed an internal grievance by sending a letter to Hardesty on June 9, 2010. He claimed that Claypool never told him the number of hours to enter on his timecard, that he was on call for two days and that, since a Site Mechanic is paid for 8 hours per day regardless of how long he is actually at the site, he could only assume that he should enter 8 hours on his timecard. (Murphy Dep. Ex. 22.)[70] Defendant notes that he did not claim that he was terminated because of his age. (Murphy Dep. at 252.) Plaintiff indicates that he did not address Claypool's discriminatory animus towards him in his internal grievance to Hardesty; he only offered evidence to show that he had not intentionally violated any CEM

---

[67] ECF No. 32 Ex. 29.
[68] ECF No. 32 Ex. 29.
[69] ECF No. 31 Ex. 6.
[70] ECF No. 32 Ex. 41.

policy because he believed he was recording his time correctly. (Murphy Dep. Ex. 22.)

On July 20, 2010, CEM President and CEO Doug Garretson met with Murphy. In an email to Hardesty following this meeting, Garretson wrote as follows:

> When asked if he ever attended a training session on recording time, he denied it. I am led to believe that Rick Claypool did present a session on properly recording time and had each AMT sign a roster testifying to their attendance. I will double check this at some point with Rick.
>
> When asked if he approached Rick prior to working the assigned shifts about how to record his time he responded,
>
> 1-Once, I was working on an aircraft as Rick walked through the hangar. I asked him as he went by but he "either didn't hear me or ignored me."
>
> 2-On a second occasion, I was in the hangar and I "hollered at Rick" but got no answer. Clearly, he never followed up and went to Rick's office to discuss the situation.
>
> When asked if he ever discussed recording time for his weekend assignment with any other AMT he responded, "no", he didn't ask anyone else because "they may be wrong" because no one ever was assigned to cover a base on a weekend like this ("no one ever did this"). He then followed up by telling me every other AMT has worked like this. (?)
>
> He did mention he was aware of Hangar AMTs being assigned to cover a base during a regularly assigned work day. In these cases, he said the AMT reported to the base, did the "daily" and went home, but recorded 8 hours for the day. I see the difference here in that it was a regular work day, the employee was guaranteed 40 hours/week and the base they were assigned to may have made it illogical to report to the base, possibly drive a considerable distance to the hangar, only to potentially be called back to the base for an emergency (for which, he must be able to respond within a certain pre-determined time). Had this same employee been given the responsibility to handle a base on his off-day, he would not have been paid 8 hours, just the time he spent doing the "daily" or anything else required that day, which is what John Murphy should have done.
>
> I am prepared to uphold the termination based on this interview coupled with my knowledge of the statements his colleagues provided and an interview I held with Rick Claypool prior to meeting with [Murphy].

(Hardesty Dep. Ex. 44.)[71] In a follow-up email sent to Hardesty a few minutes later, Garretson wrote: "Rick Claypool did provide instruction on how to properly record time in KRONOS, and John Murphy was present, however no attendance record was kept." (Id.)

Murphy's EEOC Charge

After he was terminated, Murphy filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) as a procedural prerequisite to initiating this action. (Murphy Dep. at 269 & Ex. 24.) Defendant contends that, during his intake interview and in the questionnaire, Murphy offered the EEOC a reason other than age as to why he felt he had been treated disparately. (Murphy Dep. at 206; ECF No. 27 Ex. A.) Specifically, it contends that Murphy indicated there was tension between him and Claypool, and Murphy believed he had been retaliated against for pointing out an error to Claypool in the year before his discharge. (Murphy Dep. at 204-08.)

In a statement Murphy wrote to the EEOC on July 28, 2010 explaining what his witnesses would tell the EEOC, Murphy wrote that Horgan "knows my immediate supervisor was retaliating against me for a deficient 'letter of reprimand' the previous fall." (ECF No. 27 Ex. A.) Murphy also wrote that, "I believe [Claypool] is retaliating against me for pointing out his errors on a letter of reprimand he tried to give me, which proved to be seriously flawed." (Id.)

Murphy responds that he clearly testified:

Q: Did you tell the EEOC there were problems between you and Rick Claypool?

A: The problems that I told them about was I thought I was being singled out by him [Claypool] because of my age.

(Murphy Dep. at 204.)

---

[71] ECF No. 40 Ex. M.

In a letter to Murphy dated August 2, 2011, Frank Rodia, the EEOC investigator, wrote:

> During your intake interview and in your questionnaire you offered a reason other than age, as to why you felt you were treated disparately. You indicated that there was tension between you and Claypoole (sic) and you believed you were retaliated against for pointing out an error to Claypoole (sic) in the year prior to your discharge. Such retaliation although unfair would not be a violation of the ADEA.

(Murphy Dep. Ex. 20.)

Plaintiff notes that this document expresses only Rodia's opinion of evidence provided to him by Murphy and CEM. Plaintiff contends that he made no admission to Rodia that there was a reason other than age that he was treated disparately. At his deposition, he acknowledged only that this is what Rodia's letter said. (Murphy Dep. at 206.)[72] Murphy expressly disputed this in the rebuttal statement he submitted to Rodia. Murphy states that he cited the inaccurate and unfair written reprimand issued to him by Claypool as evidence of Claypool's age-based animus—and more clearly expressed this in his rebuttal statement to the EEOC, dated August 17, 2011. (Murphy Dep. Ex. 27.)[73]

On August 29, 2011, the EEOC closed its file in this matter and issued a Notice of Right to Sue letter, stating:

> The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

(Murphy Dep. at 272-73 & Ex. 25.)

Procedural History

Plaintiff filed this action on November 28, 2011. He alleges that Defendant

---

[72] Pl.'s Sur-reply App. (ECF No. 39) Ex. 51.
[73] ECF No. 32 Ex. 44.

discriminated against him on the basis of his age when it terminated him on June 8, 2010.  On

October 15, 2012, Defendant filed a motion for summary judgment.  Plaintiff filed a brief in

opposition on November 19, 2012.  Defendant filed a reply brief on December 7, 2012 and

Plaintiff requested and received leave to file a sur-reply brief, which he filed on December 26,

2012.

Standard of Review

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide

that: "The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts

sufficient to establish the existence of any element essential to that party's case, and for which

that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986).  The moving party bears the initial burden of identifying evidence which demonstrates

the absence of a genuine issue of material fact.  Once that burden has been met, the non-moving

party must set forth "specific facts showing that there is a genuine issue for trial" or the factual

record will be taken as presented by the moving party and judgment will be entered as a matter

of law.  Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An

issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party.  Anderson v. Liberty- Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the

non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's

favor.  Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County

of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

<u>ADEA Claims</u>

The ADEA provides that it is an unlawful employment practice for an employer to discharge or discriminate against any individual because of such individual's age if that individual is over 40. 29 U.S.C. §§ 623(a), 631(a). The PHRA also prohibits such discrimination. 43 P.S. § 955(a). In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of discrimination indirectly following the shifting burden analysis set forth by the Supreme Court in <u>McDonnell Douglas v. Green</u>, 411 U.S. 792, 802 (1973) and refined in <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 252 53 (1981). <u>Chipollini v. Spencer Gifts, Inc.</u>, 814 F.2d 893, 897 (3d Cir. 1987) (en banc). This model also applies to actions brought pursuant to the PHRA. <u>See</u> <u>Connors v. Chrysler Fin. Corp.</u>, 160 F.3d 971, 972 (3d Cir. 1998).

As the Court of Appeals for the Third Circuit has stated:

> The existence of a prima facie case of employment discrimination is a question of law that must be decided by the Court. It requires a showing that: (1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action...

<u>Sarullo v. U.S. Postal Serv.</u>, 352 F.3d 789, 797 (3d Cir. 2003) (footnote and citations omitted).

The Court of Appeals has indicated that, to state a prima facie case of age discrimination in a termination case, a plaintiff must establish that she was at least 40 years of age, that she was qualified for the position, that she suffered an adverse employment decision and that she was replaced by a sufficiently younger person to create an inference of age discrimination. <u>Showalter v. University of Pittsburgh Med. Ctr.</u>, 190 F.3d 231, 234 (3d Cir. 1999) (citation omitted).

If the employee presents a prima facie case of discrimination, the employer must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]."

McDonnell Douglas, 411 U.S. at 802.  If the employer specifies a reason for its action, the

employee must have an opportunity to prove the employer's reason for the adverse employment

action was a pretext for unlawful discrimination.  Id. at 804.  The Court of Appeals has stated

that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's
> proffered  legitimate  reasons must allow a factfinder to reasonably infer that each
> of the employer's proffered non-discriminatory reasons was either a post hoc
> fabrication or otherwise did not actually motivate the employment action  (that is,
> the proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

With respect to the ADEA, the Supreme Court has held that shifting the burden of

persuasion is improper because the plain language of the statute requires the plaintiff to prove

that the defendant took the action "because of the plaintiff's age."  Gross v. FBL Financial

Servs., 557 U.S. 167 (2009).  Nevertheless, the Court of Appeals has held that Gross "does not

forbid our adherence to precedent applying McDonnell Douglas to age discrimination cases"

because McDonnell Douglas does not require shifting the burden of persuasion, but only the

burden of production.  Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009).

Nevertheless, and unlike a case brought under Title VII, "in order to demonstrate pretext under

Fuentes, it is incumbent upon the plaintiff to demonstrate that age was a determinative or 'the

"but-for" cause of an employer's adverse decision;' it is not sufficient to simply show that age

was 'a motivating factor.'"  Hodczak v. Latrobe Specialty Steel Co., 761 F. Supp. 2d 261, 268

(W.D. Pa. 2010) (McVerry, J.) (quoting Gross, 557 U.S. at 174), aff'd mem., 451 Fed. Appx.

238 (3d Cir. 2011).

Defendant concedes for purposes of this motion that Plaintiff can set forth a prima facie

case of discrimination.  However, it argues that it has proffered a legitimate, non-discriminatory

reasons for his termination (namely that he falsified his timecard by putting down time that he did not actually work, as he admits) and he has failed to present evidence from which the trier of fact could conclude that this reason was a pretext for unlawful age discrimination. Defendant contends that Plaintiff cannot survive summary judgment because he must show that age was the determinative factor (not merely one of several factors) and he himself told the EEOC investigator of a non age-related reason why he was fired – Claypool's retaliation against him for pointing out an error in the letter of reprimand that Claypool had given him. It also argues that, because Plaintiff alleges that the only person who discriminated against him was Claypool, his claim cannot survive because the decision makers were Hardesty and Horgan, not Claypool. Finally, in the alternative, Defendant argues that it is entitled to partial summary judgment on the issue of back pay damages because Plaintiff voluntarily accepted a position in Philadelphia which essentially resulted in him making less money.

Plaintiff responds that Claypool's letter of reprimand and his subsequent retaliation are evidence of and are related to Claypool's age-based discriminatory animus against him, and he further contends that Defendant cannot rely on an EEOC investigator's opinion based on information Plaintiff provided in an intake questionnaire. Moreover, Plaintiff disputes that he "admitted" that he violated company policy and in fact he has always maintained that he properly completed the time card the way a Site Mechanic would as that was the role he was assigned for Memorial Day weekend. In addition, Plaintiff argues that he has pointed to other, younger employees who filled out time cards in the same way and were not terminated or even disciplined as a result.

With respect to Defendant's argument about Claypool not being the decision maker, Plaintiff responds that the Supreme Court has held that an employer may be liable even if the

supervisor exhibiting discriminatory animus was not the ultimate decision maker, so long as that supervisor was the proximate cause of the employer's decision. Plaintiff asserts that Hardesty and Horgan were influenced by Claypool and thus CEM can be held liable for Claypool's actions.

Plaintiff argues that Claypool, Horgan and others referred to him as "Old Man" and "Blue" and that Horgan described him as being "set in his ways" just a few weeks before he was terminated. He contends that these comments can be considered as evidence of age based discriminatory animus in the workplace. Finally, Plaintiff contends that he did mitigate his damages and that there are genuine issues of fact as to whether his position at L.J. Aviation was "substantially equivalent" to his position at CEM.

In a reply brief, Defendant argues that, to the extent Plaintiff is now arguing that the letter of reprimand he received from Claypool in October 2009 constituted an act of age discrimination, such a claim fails for a variety of reasons. Specifically: he never raised it to the EEOC and it would have been untimely if he had raised it (because it occurred more than 300 days he filed his charge of discrimination on October 17, 2010); it is not within the scope of the charge he filed; he did not consider it to be a reprimand and it did not affect his pay; it was Cura, rather than Claypool, who made the decision to give him the written warning and Horgan (who Plaintiff testified was fair to everyone) and Tom Rolison complained about the fact that Plaintiff was not answering telephone calls; it is undisputed that Claypool never had any complaints about anyone else not answering telephone calls so there would be no basis to conclude that Plaintiff was treated differently; and in his complaint to Cura, Plaintiff never indicated that he felt the reprimand was the result of age discrimination.

Defendant also argues that Plaintiff cannot discredit its proffered reason by asserting that

CEM was wrong in its belief that he falsified his time card, and it is undisputed that he put down nine hours on the time card but did not work nine hours. Three other Fixed Base Mechanics told him that he was not supposed to put down eight hours for the day, but he refused to listen to them. Rather, they heard him "expressing his disgust about being 'on call' over the past weekend" and stating that he "should be paid 8 hours a day for his inconvenience." (Hardesty Dep. at 43.) Defendant contends that Plaintiff cannot compare himself to Winkle, who put down eight hours a day when he covered a Site Mechanic position during a week (and Fixed Base Mechanics are guaranteed 40 hours of work for the week) as opposed to being on call over a weekend. Nor, it argues, can Plaintiff compare himself to Peagler, because Peagler did not engage in the same conduct he did.

Defendant argues that Hardesty and Horgan made the decision to terminate Plaintiff based on the statements forwarded by Winkle, Backo and Deemer and Plaintiff's e-mail attempting to sell his overtime, and that Claypool's involvement consisted of forwarding various materials requested by Hardesty. It further contends that Plaintiff's citation of stray remarks does not alter the result, particularly because they were not made during the decision making process, they were not about age, and Plaintiff himself used the nickname "Blue 2" to refer to a co-worker at C.J. Systems. It argues that the fact that Plaintiff was the oldest Fixed Base manager does not create a discriminatory inference. Finally, it contends that the record is undisputed that Plaintiff failed to mitigate his damages and he cannot submit an affidavit to contradict his deposition testimony on this matter.

Plaintiff has filed a sur-reply, in which he contends that: 1) Defendant relies on two sentences he wrote on an intake questionnaire to an EEOC investigator, but ignores contradictory evidence he subsequently produced to the EEOC and in this case that supports his contention that

Claypool's October 2009 letter of reprimand evidences that Claypool treated him differently from younger CEM employees; 2) the Court can consider evidence related to the October 2009 letter of reprimand as relevant to his claim and the record is disputed as to whether Winkle's situation was comparable to his; 3) he has met the appropriate factors for imposing liability on CEM by proffering evidence of Claypool's age-based bias (he tracked only Plaintiff's phone calls, did not follow the disciplinary procedures and called him "Blue" and "Old Man"), citing evidence that Claypool referred to him as a "disgruntled employee" and suggested to Horgan that Plaintiff had falsified his time card, and demonstrating that the statements given by Winkle, Backo and Deemer do not match the severity of Horgan's response to Claypool's report of the incident to him and should not have led to his termination; 4) Defendant cannot claim that it could not have discriminated against him based on his age when it had hired him at age 55, because Claypool was not employed by CEM at the time he was hired and the Court of Appeals has rejected this kind of argument; and 5) Plaintiff's affidavit does not contradict his deposition testimony, but merely supplements it and provides additional evidence that he has continued to search work in an attempt to mitigate his damages in the time since his deposition.

Many of the arguments presented can be addressed very briefly. First, Plaintiff's claims are not foreclosed based upon what he wrote on a witness list to the EEOC or the letter written by the EEOC investigator on August 2, 2011. Defendant cites no authority for this argument, which does not follow from the case law. The Court of Appeals has long held that the decision-making authority in an employment discrimination case rests with federal courts, not the EEOC. Fakete v. U.S. Steel Corp., 424 F.2d 331, 336 (3d Cir. 1970). The Court of Appeals has also held that whether or not to admit an EEOC Letter of Determination into evidence is to be determined by the district court on a case-by-case basis, depending upon whether it is more

probative than prejudicial. <u>Coleman v. Home Depot, Inc.</u>, 306 F.3d 1333, 1345 (3d Cir. 2002).

Based upon this authority, Judge McVerry of this Court has twice opined that an EEOC Letter of

Determination in which the agency checks the "unable to conclude" box is "essentially a non-

decision" that is of marginal if any probative value. <u>Berry v. Georgetown Inn, Ltd.</u>, 2010 WL

608076, at *1-2 (W.D. Pa. Feb. 18, 2010); <u>Kirby v. J.C. Penney Corp.</u>, 2009 WL 3572494, at *2

(W.D. Pa. Oct. 26, 2009). Judge McVerry further concluded that allowing the defendant to

introduce reports or correspondence from EEOC investigators would waste time, cause undue

delay and result in the needless presentation of cumulative evidence. <u>Berry</u>, at *2; <u>Kirby</u>, at *3.

In addition, since the investigator's letter in this case permitted Plaintiff to submit a rebuttal and

he did so, giving any weight to his preliminary observations would be manifestly inappropriate.

Second, the Supreme Court has held that the anti-discrimination statutes do not "bar an

employee from using the prior acts as background evidence in support of a timely claim."

<u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 113 (2002). Thus, Plaintiff may refer

to the October 2009 written reprimand he received as background evidence without having to

submit it to the EEOC as a separate claim for age discrimination. Plaintiff is not contending that

the reprimand constituted an adverse employment action and is not seeking damages based upon

it.

Third, Plaintiff's claims are not foreclosed because Claypool was not the official at CEM

who formally made the decision to terminate him or because he did not offer his opinion to

Hardesty. In <u>Staub v. Proctor Hospital</u>, 131 S.Ct. 1186 (2011), a case brought under the

Uniformed Services Employment and Reemployment Act of 1994 (USERRA), the Supreme

Court held that, "if a supervisor performs an acts motivated by antimilitary animus that is

<u>intended</u> by the supervisor to cause an adverse employment action, and if that act is a proximate

cause of the ultimate employment action, then the employer is liable under USERRA." <u>Id.</u> at 1194 (footnotes omitted). Such a situation invokes the "cat's paw" theory of liability, based upon Aesop's fable of the monkey who induces a cat by flattery to extract roasting chestnuts from the fire, and the cat does so, burning its paws in the process and the monkey makes off with the chestnuts and leaves the cat with nothing. <u>Id.</u> at 1190 n.1. The Court of Appeals has applied this reasoning to cases under Title VII, <u>McKenna v. City of Philadelphia</u>, 649 F.3d 171 (3d Cir. 2011), and the ADEA, <u>Marcus v. PQ Corp.</u>, 458 F. App'x 207, 212 (3d Cir. 2012).[74] <u>See also</u> <u>Simmons v. Sykes Enters., Inc.</u>, 647 F.3d 943, 949-50 (10th Cir. 2011). Thus, the fact that Hardesty and Horgan were the ultimate decision makers does not preclude CEM for being held liable for Claypool's actions if they were the proximate cause of Murphy's termination. Contrary to Defendant's contention, there is sufficient evidence of Claypool's actions here to establish proximate cause: he brought the issue to Horgan when the mechanics approached him, gathered the statements from the mechanics and forwarded them to Hardesty along with comments about Murphy, and he even spoke to Garretson before Garretson met with Murphy to discuss his grievance and uphold the termination.

Finally, Defendant argues that, because it hired Plaintiff when he was 55 years old, it cannot be found to have been motivated by age bias when it fired him two years later. Plaintiff responds that Claypool, who allegedly possessed the discriminatory animus, did not work for CEM when he was hired. The Court of Appeals has not relied upon inferences such as this one, but requires courts to examine the facts and the law in each case. <u>See</u> <u>Pivirotto v. Innovative</u>

---

[74] Several other courts of appeals have expressed doubt, based on <u>Gross</u> and the differences between the ADEA and other anti-discrimination statutes, that the cat's paw theory can be applied to ADEA claims. <u>See</u> <u>Sims v. MVM, Inc.</u>, 704 F.3d 1327 (11th Cir. 2013); <u>Holliday v. Commonwealth Brands, Inc.</u>, 483 F. App'x 917, 922 n.2 (5th Cir. 2012), <u>cert. denied</u>, 2013 WL 598541 (S.Ct. Feb. 19, 2013).

Sys., Inc., 191 F.3d 344, 355 (3d Cir. 1999) (refusing to adopt inference that employer could not have discriminated against a woman because it hired a woman to replace her); Waldron v. SL Industries, Inc., 56 F.3d 491, 496 n.6 (3d Cir. 1995) (refusing to adopt "same actor" inference which would allow an employer to argue that, because the same person hired and fired the employee, that person could not have acted with discriminatory intent). This argument should be rejected.

Defendant's Proffered Reason and Plaintiff's Evidence of Pretext

Defendant contends that Plaintiff was terminated because he falsified his time card by putting down nine hours of work when he admittedly did not work that amount of time. Defendant has thus satisfied its relatively light burden of production. Krouse v. American Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997).

Plaintiff argues that this proffered reason is a pretext for unlawful age discrimination and proceeds along "Fuentes prong one" by arguing that he has submitted evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reason. Keller v. ORIX Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc). He also proceeds along "Fuentes prong two" by arguing that Defendant's own evidence "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Keller, 130 F.3d at 1111.

"But for" causation

Defendant argues that Plaintiff fails to proffer evidence that his age discrimination was the but for cause of his termination, citing evidence that he referred to another, non-age bias reason (retaliation by Claypool). It cites Homel v. Centennial School District, 836 F. Supp. 2d 304 (E.D. Pa. 2011). In that case, Sandy Homel alleged a number of claims (First Amendment

retaliation, sex discrimination, age discrimination and retaliation discrimination) arising out of a school district's decisions to remove her from the position of assistant superintendent, to pass over her for the position of superintendent in favor of an applicant 22 years younger and to replace her as director of secondary education with an employee 24 years younger.  The court concluded that her age discrimination claims did not survive summary judgment because, at the third stage of the McDonnell Douglas test, she merely attacked the factual assertions on which the board's reasons were based and provided an alternative account (that the board retaliated against her for making EEOC complaints and her refusal to accept a board member's allegedly improper quid pro quo offer) that did not involve age bias.  The court held that Homel was trying to use a mixed motives theory to prove age discrimination, a legal theory no longer permitted after the Supreme Court's decision in Gross.  Id. at 317-18.

However, in this case, Plaintiff is not trying to use a mixed motives theory and, as noted above, he does not concede that he was fired based upon retaliation from Claypool.  Rather, he asserts that Claypool's actions were motivated by age bias against him.

Nevertheless, Plaintiff's claims fail to survive summary judgment because he has not pointed to evidence of pretext.  Plaintiff relies upon three pieces of evidence which, whether considered separately or together, do not meet his burden: 1) his version of the events surrounding his termination; 2) the treatment of another employee; and 3) alleged age-based comments made in the workplace.

The evidence, viewed in the light most favorable to Plaintiff, reveals that Claypool was aware of the following facts: 1) Murphy, who had a history of requesting that he not be given on-call assignments, was assigned to cover both the hangar and the base on Memorial Day weekend and had attempted to avoid this assignment, first by offering to pay another mechanic to take the

duty for him (but no one accepted his offer) and then by complaining to Horgan that he did not feel comfortable inspecting the planes (to which Horgan responded by directing that Murphy receive additional training); 2) after completing his on-call weekend, Murphy told three other mechanics that he had put down 8 hours of time, as a Site Mechanic would, even though he had not actually worked 8 hours each day; 3) the three mechanics (cumulatively) told him that this was not right and that he should only put down one hour for the hangar and one hour for the site but that he responded that he was putting down 8 hours "for his inconvenience," observed that he was "disgusted" about having to be on call over the weekend and wished him "good luck" because they did not think CEM would pay for the hours he put down; 4) Murphy did not change his timecard based upon what the mechanics said, nor did he seek advice from Claypool or anyone else to see if his timecard was correct; 5) the three mechanics told Claypool what they had told Murphy; and 6) there had been a meeting at which mechanics were told how to record their time in this situation.

Plaintiff focuses on what the mechanics did not say, that is, they did not explicitly accuse him of "falsifying his timecard" or "lying" about how much time he worked over the weekend. He argues that their statements do not support the severity of the response. However, it was not the mechanics' responsibility to determine if Murphy committed a violation of CEM rules or to recommend an appropriate response. The significance of their statements is that they do not merely neutrally report that Murphy had put down eight hours of time, as he contends.

Moreover, Plaintiff appears to be arguing that there were two inferences that could have been drawn from the evidence: 1) he simply did not know how to fill out his timecard for the weekend and made an innocent mistake based upon what he knew Site Mechanics did; and 2) he knew or had good reason to know (based on the meeting and the advice given to him by the three

mechanics) that he had filled out the timecard improperly and yet he failed to change the timecard or ask a supervisor for guidance, possibly because he was "disgusted" that he had to be on call over the weekend and intended to charge CEM for his "inconvenience." Even if this is so, CEM's decision to draw the second, equally plausible inference cannot constitute evidence that it was motivated by age discrimination. Claypool may not have given Murphy every benefit of the doubt, but that does not demonstrate that he was engaging in age discrimination.

Plaintiff argues that his belief that he should have been paid as a Site Mechanic when he covered for a Site Mechanic over the weekend "must be taken as true at this stage" of the case. (ECF No. 29 at 17.) This is incorrect: it is Plaintiff's burden to proffer evidence from which the trier of fact could conclude that CEM's articulated reason for his termination—that he knew or should have known that he was improperly requesting to be paid for time he did not work but persisted in doing so anyway—is a pretext for unlawful age discrimination. He has not met his burden.

Next, Plaintiff contends that he was not treated similarly to another younger employee, James Peagler (age 26 in 2009). (Claypool Dep. at 60.) About six months before Murphy's termination, Peagler, a Fixed Base Mechanic, was first given verbal warnings (for using his phone while working and for not slowing down), then a final written warning on April 10, 2009 (for performing an improper aircraft inspection), then a letter of termination on April 30, 2009 (for failing to follow manufacturer's guidelines during another maintenance task). (Claypool Dep. at 113-14, 117;[75] Claypool Dep. Ex. 7.[76]) Defendant responds that Peagler engaged in different conduct than Murphy (failing to properly inspect aircraft) and therefore was not similarly situated. Furthermore, it contends that Peagler's termination letter was signed by Cura,

_____

[75] ECF No. 40 Ex. L.
[76] ECF No. 31 Ex. 11.

who could not have discriminated against Murphy when Murphy was terminated because Cura was not employed by CEM when Murphy was terminated. In addition, it is undisputed that Cura made the decision to terminate Peagler. (Claypool Dep. at 120-21.)[77]

Plaintiff contends that, despite Peagler's repeated serious offenses (which CEM stated could have led to "disastrous" and "catastrophic" results), Claypool never performed a micro-analysis of his cell phone records or maintained a file tracking his performance as he did with Murphy. Defendant responds that Claypool did not receive complaints that Peagler was not answering his telephone, so there would have been no need to analyze his cell phone records as he did with Murphy, and denies that Claypool "maintained a file tracking" Murphy's performance. To the contrary, the performance reviews Claypool conducted of Murphy were positive and stated he was a "knowledgeable and valuable" employee. Claypool kept records of Murphy's telephone calls because of the complaints he was receiving about Murphy not answering his calls.

Plaintiff states that Peagler's disciplinary letters included an explanation of CEM policy and of his right to utilize CEM's grievance procedure. Defendant responds that Murphy's termination letter contained an explanation of CEM policy and his right to use the CEM grievance procedure, which he in fact used.

Plaintiff states that Peagler was permitted to resign in lieu of discharge. (Claypool Dep. Ex. 8.) Claypool testified that Cura gave Peagler the option to resign but Peagler wanted to be terminated. (Claypool Dep. at 125.)[78] Defendant responds that there is no evidence that Murphy requested to resign.

A company's failure to follow its own policy with respect to other similarly situated

_____

[77] ECF No. 40 Ex. L.
[78] ECF No. 40 Ex. L.

individuals can constitute pretext.  Fasold v. Justice, 409 F.3d 178 (3d Cir. 2005).  Nevertheless, "[i]In determining whether similarly situated nonmembers of a protected class were treated more favorably than a member of the protected class, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action."  Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 647 (3d Cir. 1998) (citation omitted).  Plaintiff has not demonstrated that he was similarly situated to Peagler.  Peagler committed what CEM deemed to be negligent inspections of aircraft, whereas CEM concluded that Murphy had intentionally falsified his timecard.  It is noted that CEM's Disciplinary and Discharge Policy indicates that discharge is listed as being appropriate for "serious violations" which include "theft, dishonesty, possession of stolen goods."  (Claypool Dep. Ex. 12 at MURPHY 50.)[79]  It is not this Court's role to determine whether CEM correctly concluded that Murphy's conduct was more serious than Peagler's.

The Court of Appeals has held that, to discredit the employer's proffered reason, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."  Fuentes, 32 F.3d at 765 (citations omitted).  The Court "do[es] not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practice, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere."  Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 332 (3d Cir. 1995) (citation omitted).  Thus, even if CEM was overly harsh in terminating Murphy immediately as opposed to the step process it utilized with Peagler (who engaged in different behavior) or mistaken when it

---

[79] ECF No. 31 Ex. 15.

concluded that he intentionally falsified his timecard, this would not demonstrate that it acted out of discriminatory animus.

Finally, Plaintiff cites to comments made about him in the workplace. Murphy states that, after CEM acquired Stat MedEvac in 2007, it hired a number of employees who had been working together at C.J. Systems, specifically Claypool, Cura, Winkle, Horgan, Steve Guskey and Murphy himself. (Claypool Dep. at 48-49.) At C.J. Systems, the employees had given each other nicknames, some of which were based on movie characters. (Claypool at Dep. 49-54.) For example, Claypool was called "Mongo," a character in Blazing Saddles; Horgan was called "Fat Bastard," a character from Austin Powers; and Murphy and Paul Ciccone were called "Blue" or "Blue 2" based upon a character in Old School, or "Old Man." (Claypool Dep. Ex. 3[80]; Claypool Dep. at 49-50.) In Old School, "Blue" was played by an 83-year-old Patrick Cranshaw. Plaintiff states that "Blue" is the oldest member of a misbegotten college fraternity whose age and frailty are a running joke throughout the film. Ultimately, "Blue" drops dead of excitement just before a wrestling match. (Murphy Dep. Ex. 27 at 3[81]; Murphy Dep. at 105-08.[82])

Murphy states that, initially, he tried to ignore his nicknames, especially since his supervisors were among those who referred to him in this way. Over time, the constant references to his age wore on him and he tried to avoid any manager or co-worker who used these epithets. (Murphy Dep. at 96, 104-05.)[83]

Murphy testified that Claypool called him "Old Man" several times a week after he stated working at CEM in September 2007. (Murphy Dep. at 93-94.)[84] Rolison did the same, and

---

[80] ECF No. 33 Ex. 9.
[81] ECF No. 32 Ex. 44.
[82] ECF No. 32 Ex. 32.
[83] ECF No. 32 Ex. 32.
[84] ECF No. 32 Ex. 32.

Horgan and Cura did so occasionally because they were not in the hangar very much. (Murphy Dep. at 99-101.) Claypool also continued to call him "Blue" several times a week. (Murphy Dep. at 102-03.) Hogan, Cura and Rolison would do so only occasionally. (Murphy Dep. at 102.)

Murphy testified that, on one occasion, Claypool sent him home because his back was hurting him and, on another occasion, when the mechanics heard a loud noise, he remarked, "well, hell, if the Old Man can hear it, then, you know, it must be loud." (Murphy Dep. at 94, 244;[85] Murphy Dep. at 129.[86])

Defendant argues that Blue was a "beloved" character who age and frailty were not running jokes in the movie, that Plaintiff admitted that Old School was a "funny movie," that Claypool stated that he called Murphy "Blue" because he (Murphy) was funny like Blue and because of his gray hair but not his age, and that he was no longer called "Blue" after he was hired at CEM. (Murphy Dep. at 106; Claypool Dep. at 45-48, 52-53, 56, 249.)[87] Defendant also argues that Murphy could not have been offended by being called "Blue" because he admitted that he occasionally called his co-worker Paul Ciccone "Blue 2" (until Ciccone died in 2006) and did not intend to offend him by doing so. (Murphy Dep. at 115-16.)[88] However, the facts must be viewed in the light most favorable to Plaintiff. Claypool may have testified that he no longer called Murphy "Blue" at CEM, but Murphy has testified that he did. And Murphy testified that being called "Blue" by his supervisors did bother him. As noted above, this Court cannot make

---

[85] ECF No. 32 Ex. 32.
[86] ECF No. 40 Ex. J.
[87] ECF No. 40 Ex. J; ECF No. 40 Ex. L. Testimony by several of the witnesses suggests that the individuals who were hired by CEM as supervisors (Claypool, Horgan and Cura) did not retain the nicknames they had at C.J. Systems. (Murphy Dep. at 117-18, ECF No. 40 Ex. J; Horgan Dep. at 86-88, ECF No. 40 Ex. K; Winkle Dep. at 12-13.)
[88] ECF No. 40 Ex. J.

credibility determinations in the context of a motion for summary judgment. In addition, it is not necessary for this Court (nor would it be necessary for trier of fact, if the case were to proceed to trial) to independently view the movie Old School and determine how the character of "Blue" is portrayed therein, as the issue in this case is how Murphy was treated at CEM.

More significantly, Defendant argues that the comments Plaintiff claims Claypool made are stray remarks that do not constitute evidence of pretext. The Court of Appeals has held that: "Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." Fuentes, 32 F.3d at 767 (citation omitted).

The Court of Appeals has held that:

> `When considering whether remarks are probative of discrimination, we consider the speaker's position in the organization, the content and purpose of the statement, and the "temporal connection between the statement and the challenged employment action." Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 133 (3d Cir. 1997). Here, although several of the statements were made by LSS executives, they were temporally remote from the decision to discharge Appellants, and completely unrelated to the investigation regarding Appellants' violation of the EC Policy. Thus, the comments qualify as "stray remarks" and are entitled to minimal weight. See Ezold v. Wolf, Block, Schorr & Solis–Cohen, 983 F.2d 509, 545 (3d Cir. 1992).

Hodczak v. Latrobe Specialty Steel Co., 451 F. App'x 238, 241 (3d Cir. 2011).

Plaintiff argues that Claypool called him "Old Man" and "Blue" several times a week, therefore he must have done so close to the time he was terminated. However, this is not a proper argument. Plaintiff has not argued that Claypool made any age-based remarks in the context of the timecard dispute or any event leading up to his termination. Therefore, the "Old Man" and "Blue" comments are stray remarks that do not constitute evidence of pretext.

Plaintiff has failed to point to such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that

a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non discriminatory reasons." <u>Fuentes</u>, 32 F.3d at 765. Therefore, Defendant's motion for summary judgment should be granted.

For these reasons, it is recommended that the motion for summary judgment filed on behalf of the Defendant (ECF No. 24) be granted.

Litigants who seek to challenge this Report and Recommendation must seek review by the district judge by filing objections by March 20, 2013. Any party opposing the objections shall file a response by April 3, 2013. Failure to file timely objections will waive the right of appeal.

Respectfully submitted,

s/Robert C. Mitchell_____
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: March 6, 2013